Good morning. A patent case, a case from the Court of International Trade, a veterans case, and three government employee cases. Two of the employee cases and the veterans case are being submitted on the briefs and will not be argued. The first case is Edwards Lifesciences v. Cook and Gore. Mr. Abrams, you are representing Edwards. Yes. May it please the Court, the district court erred in its claim construction when it said that the claims include two limitations, interluminal and malleable wire, that had been deleted from the claims during the prosecution history. Did it help me to know what advance this made over prior art? I know that's not before us, but did it help me? Actually, this invention is considered to be one of the most technologically significant inventions in this area. And that's from the quote in our briefs. What this invention involves is using interluminal grafts or grafts to treat abdominal aortic aneurysms. An aneurysm is a swelling or... I've got all that. What was the advance over the prior art? The advance was overlapping of two grafts. The fact that one could take two grafts and overlap... So an existing sewn-in graft is now done interluminally. You're grafting onto an old graft interluminally, and this is the patent that discusses that. Well, there's a couple of ways you can do it. One could do it that way, as you described, or one could put two or more parts interluminally. So in other words, the base structure that can be placed interluminally, or it could have been a sewn graft where an aneurysm is formed around the end of that, and then a second graft is placed to overlap with the first. Yeah, I got it. Go ahead. And the reason that is so important is because of the tortuous anatomy, doctors, in doing this interluminally, couldn't tell how long the graft should be. And what these inventors... One of the points of your appeal is that the court erred in interpreting the claims to require that the grafts be interluminal. Well, in your answer to Judge Grader, I heard the word interluminal several times. And, in fact, when I look at the specification, interluminal is all over the specification. And it never mentions a sewn-in graft. Well, let me address that. First of all, there's no question that this relates to interluminal grafts in the sense that at least one of the components is placed interluminal. This is not taking an open operation where one is sewing in both grafts. But what is disclosed in the specification, first of all, is there's no question that the... bifurcated base structure is disclosed in the specification. Second, in the specification is also disclosed cloth or Dacron or PTFE used with the bifurcated base structure. That's at Column 2, near the end of Column 2 in Line 63. And there's also disclosed at Column 4, Line 8, a graft structure that's overlapped that has no reinforcing wires. And so what has been disclosed here are what the inventors described as the preferred embodiment is first placing a bifurcated graft interluminally, then placing a second graft interluminally. There is no other embodiment other than an interluminal. And, in fact, as I mentioned earlier, the present invention relates to an interluminal graft. In Column 1, it probably appears a half a dozen times. That is the invention. So why do you argue that the trial court erred in interpreting it, the claims to be interluminal? Because we never say the present invention requires both pieces to be interluminally placed. The present invention relates to an interluminal graft. The present invention is directed to an alternative form of interluminal graft. And the first aspect consists of an interluminal graft. It's all over. Absolutely. And one of the pieces is placed interluminally, because the overlapping that occurs here, the invention, the overlapping, has to occur interluminally. But this is, if I could give an analogy, say one were to come up with a new plug and a socket, and you design a new plug and socket, and you get claims to that combination. That doesn't mean that one couldn't say, well, I could use this plug in an old socket that's already out there. And that's what's happening here. You have claims to both pieces being new, or just as well. This applies to a situation where you have an old graft, but you're overlapping interluminally. So when we use the term interluminal graft, that's what's being referred to here. You're saying that this is the instance when you're talking about two grafts, and you keep talking about two grafts. But I don't think Claim 1 is requiring two grafts. Am I misunderstanding Claim 1? Certainly other of your claims are talking about the two graft situation, the first and second graft. But Claim 1 seems to be broader. Am I misunderstanding that? Well, Claim 1 requires a bifurcated base structure. And so that meaning, as we describe in here, that is a graft structure, or a structure that's placed already in the body. And our position is that structure could have been sewn in. That structure could have been placed previously in another way. And then it talks about a graft which is adapted to be anchored within the flow lumens of the bifurcated base structure. So I think where we are is that when we talk about a bifurcated base structure, that's referring to some type of graft structure, meaning some type of clot. But the whole issue here is when the inventors developed this invention, what they found was that this could be done with either the previously placed graft or a new graft. And that's what the claims are directed to here. Now, your best piece of evidence is that there were amendments made to try and provoke an interference that broadened it to drop interluminal and to drop malleable. But that didn't provoke the interference. Doesn't that suggest that even the examiner was of the impression that you had invented nothing but interluminal with malleable wires? To the contrary, Your Honor. I think it's our feeling that if one looks at the record, it's clear the examiner recognized these claims were broader. Why? Because, first of all, we deleted the term interluminal from graft. We deleted malleable wire from graft. So that was taken out of the claim. So the examiner saw that. Because we believe the claims are broader. We believe this is a broader invention. In your specification, you repeatedly refer to interluminal grafts. And then throughout the rest, whenever you use the word graft, it's always such grafts. So you talk about interluminal grafts, and then you say such grafts. And so when you're saying such grafts, isn't that always shorthand for the immediately previous description of an interluminal graft? So why wouldn't we assume, then, that when your claim says grafts, it's talking about the very same grafts that you referred to throughout the specification as such grafts, namely the interluminal one? Because when we use the term graft, we both use the term with interluminal, and we use it without. We use the term graft in the claim. And second— Wait, wait, wait. No, when you use it for interluminal, it seems to me only when you were talking about specifically the two things into each other. But let's put that aside for a second. Your specification says interluminal grafts probably a hundred times. You probably know the exact number. I'm sure they do if you don't. But a lot of times. And then you do sometimes say grafts, but every time it's in the context of referring back to the very interluminal grafts you were just talking about. So why don't we use that sort of definitionally? Why wouldn't that provide a definition of what the word graft means when you use it in the claim? I think if we had said by graft we mean interluminal graft and we are excluding all other kinds of graft, if we made a statement, the invention here is overlapping with two interluminal grafts, we would be bound by that. If we said the invention here is overlapping with malleable wires because the prior art showed overlapping with self-expanding wires, we would be bound by that. But that's not the case here. The reality is this specification covers a whole raft of inventions. When you talk about the overlapping embodiments, you say two interluminal grafts, plural, suggesting the grafting in and the grafted and the graftee are both interluminal. Well, the claim itself, if I want to use the language of the claim, we just say a bifurcated base structure. And so there's no reference to graft and there's no reference to interluminal. And that's the claim that the examiner looked at. And these declarations were filed, as we were talking about to answer your question from before, the declarations were filed in an effort to provoke an interference. The examiner did not enter the interference. But the examiner clearly talked to the attorney about what claims should be adopted if an interference were to be provoked. And some of those claims were eventually allowed by the examiner. Meaning the examiner clearly recognized that- Counsel, did the lower court, just so I understand, did they- Just a second. What did the examiner clearly recognize? Go ahead. I needed to hear that. My argument is that the examiner recognized this claim is broader than an interluminal graft. Because the examiner proposed to- But he didn't provoke the interference. But he said these are the claims. And he said these claims are allowable over the prior art. Given the Goethe-Chia patent, which was there, which would have been section 102E prior art, the examiner applied less relevant art. In other words, Goethe-Chia showed two pieces. But because White had filed this declaration saying, well, we're ahead of Goethe-Chia, we show a prima facie case of priority, the examiner applied that. The examiner applied the Barone reference, which was a single graft. So the examiner was saying, I think we can conclude from the record. We don't know what the examiner was thinking. But I think we can conclude from the record the examiner looked at this and said, I'm going to allow these broader claims that you've deleted interluminal. And I'm going to say that you have shown a prima facie case of priority. Now, ultimately, on a remand, it might be invalid based on that reference. Or maybe we can't show certain things. But that's for a remand. At this point, we're only looking at claim construction. And these claims where we say a bifurcated base structure, we don't use the term graft. So that's exactly what I wanted to ask you. So I'm glad you came back around to that. Did the district court hold that a bifurcated base structure must be a structure inserted interluminally? Or was it only wherever the word graft or prosthesis or something appeared? No, it's the former. In other words, the district court said a bifurcated base structure means an interluminal graft that has one opening at its upstream end and two at its downstream end. Is there anywhere in the spec where you talk about a bifurcated base structure? Yes, that was the point that I was raising before. We talk about in column four, if you look at that, we talk about the trouser graft. And what's referred to— Where is that in column four? Are you at line 22, 23-ish? If you go down to—actually, well, yes. If you go to—well, the trouser graft is actually at line 47. We use the term trouser grafts. I'm sorry, line 47. But, counsel, line 20 says, in such a case, it's possible to place a graft, according to the present invention, which has a bifurcation at its downstream end, a so-called trouser graft, wholly within the primary artery. Doesn't that necessarily mean interluminally? Because it's wholly within. Well, a sewn-in graft would be placed wholly within the artery. One would open up the body and then would sew in the graft. But it also says, in such a case, it's possible to place a graft, according to the present invention. Does the—so, it isn't saying according to any method that you could ever use, but according to the present invention. And is anywhere in the spec talked about sewing one of these things in? Well, my point is that what it talks about is— Well, look, to answer your question, does it talk about sewing? The answer is no. It doesn't use the term sewing. What it does talk about, though, is it does disclose a bifurcated base structure. And it's our position that the argument, what the court is talking about today, is a 112 argument. It's saying, well, is there an invention here? Does this invention—is there a description to support this claim, if one were to read this so broadly? But that's not where we were in the district court. In the district court, we were at claim construction. But, counsel, we use the spec to construe the claims, and this is what we're trying to do here. Obviously, this is a difficult case. But graft and bifurcated base structure are words that you use, and we have to figure out what they mean. And the specification is the number one source for ascertaining the meaning the patentee gave it. And so we're trying to understand, I think, whether or not this spec should be limited to an intraluminal graft. And so when I'm—you're pointing me to the trouser graft. I guess what I'm hoping for is that you'll point me to something in the specification that suggests something other than an intraluminal structure. Well, what I pointed to was at the bottom of column 2 at line 60, around 62, it talks about the tubular graft body is formed of a thin biocompatible material such as Dacron or PTFE. That's describing a basic graft structure. Then if you go to column 4, and you say—if you look at line 7, it says, in this case, the first or upstream graft preferably has at its downstream end a skirt without reinforcing wires. And what that is referring to is an overlap. An overlap in a piece that does not have a reinforcing wire. And a piece that does not have a reinforcing wire could be either a sonin graft or it could be an intraluminal graft where one doesn't have wires in that particular portion. But you're saying it could arguably be, but the entire specification repeatedly talks about the present invention involving intraluminal grafts. I agree that the specification discusses it that way, but— I've been over that ground 20 times. Let's go to resilient for a minute. You discuss malleable wires, and you specifically define that as not resilient to any substantial extent. How then do we find resiliency reflected at all in your invention? Well, first of all, malleable is not in the claim. Had we put malleable in the claim— I've been over that. But the spec only refers to malleable. No, Your Honor, the spec also refers to metal wires. Show me where. Sure. In column 3 at line around 39 or 40, it says the presence of metal wires in the intraluminal graft. If you'll look at column 5 at line 28 to 29, it says the wires are stainless steel. Well, stainless steel is what Cook uses in the accused product. And Cook says stainless steel is resilient or self-expanding. The point being is it's just like with intraluminal. We use the word wire with metal. We use it with stainless steel. Unlike this Court's cases where one has come in and said the present invention is X. The prior art shows something and we're limiting it. For example, the AstraZeneca case. But you discussed that resilient wires have a problem. They kink, they twist. And so we're using malleable wires to avoid that. The kinking and twisting has nothing to do with— Except in the one skirt situation where you're not using them to connect to the artery wall. You're using them to get around an existing graft. But that's why this isn't a disclaimer. The kinking and twisting has nothing to do with whether it's malleable or self-expanding. Kinking or twisting is talking about because the graft has to go around a turn. The way we deal with that is in the dependent claims where we say having wires along the length. And those wires could be malleable or they could be self-expanding. Mr. Ravens, you've consumed your time. Of course, we've asked a lot of questions. We'll give you your rebuttal time back and let's hear from the appellees. Thank you, Your Honor. Mr. Kaplan. May it please the court. You represent? Cook. And good morning. We believe that the decision below should be affirmed that the lower court got the claim construction exactly right on the two issues that matter in this case which are intraluminal and malleable. The court found an abundance of support for its claim construction embodied within the specifications. Can we start with the last point, the point that Judge Rader was discussing with your opposing counsel? And the specification does say stainless steel wires as an example of part of this invention and that's exactly what your client uses. Yes, but... Why then should they not be treated as within the definition of malleable? So since the patentee has defined malleable as including stainless steel wires, tell me what we ought to do with that. Okay, and I think what we ought to do with that is focus on that the specification is written so that the difference between malleable and resilient focuses on the manner of expansion. And this is what the court below focused on and that when it looked at a resilient wire, which is like what Cook has, it paid attention to the fact that in the Cook device you can squeeze the device and it expands by virtue of its resilience on its own. In contrast, a malleable wire, which is defined very specifically in the patent specification, there's the use of the signal IE, which is something that Judge White focused on below. It draws a distinction between resilience and malleable based on does it expand by virtue of its own resilience on its own or does it require a force to be exerted on it? So you argue the ones that use the balloon that push it a little bit further out and why doesn't that necessarily mean it is, of course, malleable because the resilience didn't get it all the way. And the balloon is antithetical to the distinction that is drawn between malleable and resilient in this case. The balloon is not used until after the device is actually deployed and attached to the aorta. The molding balloon, which is what I believe you're referring to, is used as a secondary operation. I think the court below referred to it as a finishing step where it's basically to make sure that the device can be expanded to its full extent by virtue of its own resilience. Sometimes there are pleats or creases that need to be ironed out in the graft because the graft is actually oversized to fit the vessel. And so the graft will always expand as much as it can within the confines of the vessel or if you didn't have it in a vessel and you just took it out of the catheter and released it, it would expand entirely on its own to its fullest extent. So the molding balloon has nothing to do with the self-expanding or balloon expanding, which is what the patent speaks to. But it really goes to its own. Mr. Kaplan, the patentee here withdrew from the claims the terms which the court here put back. Why didn't he err? Why wasn't that error? I think because the court... These terms were removed from the claims. Well, the terms were not specifically removed from this version of the claims. First of all, in terms of the word intraluminal, when they removed the word intraluminal as part of the 073 prosecution, which is one of the four patents, it was removed at the same time where they took the word intraluminal out of the claim. They put into the remarks the fact that they said there's still this independent claim 12, which is what they were referring to then, referred to an intraluminal graph. And I think it's sort of the fine art of wordsmithing to pretend that they didn't tell the patent office during the examination, during the prosecution, that these graphs were intraluminal. As far as malleable, that word is not in any of the claims. And so I think that's significant because the court was trying to figure out what the invention is in this case as defined by the specification. And it was understood. They made a concession during the claim construction briefing, which is something that Judge White actually focused on below before the Markman hearing. He asked a series of questions, as he sometimes is inclined to do. And he confirmed that as to the second piece, which is the focal point of the malleable issue, he confirmed with Edwards that they agreed that the graph adapted to language, the second component, called for a wire. And so even though the word wire is not part of that claim, Edwards conceded that there is a wire. And once you get to that point, it's very clear from the specification that the only kind of wire that is shown as constituting something that would provide the anchoring function is this malleable wire, meaning a not resilient wire. And in the background section, they were very clear in the specification in terms of talking about the prior art, which was self-expanding. And they said that their invention, and this is at column one, line 41 to 43, the present invention is directed to an alternative form of intraluminal graph, which provides an alternative to the known graphs. And so we kind of have two worlds in this case at both levels. This invention was designed to be in advance. The whole notion of using an intraluminal graph was supposed to be in advance over using conventional open surgery. And so at one level, the specification is very clear. Our invention is focused on intraluminal graphs as opposed to open surgery, where you're going to rip open a patient and do it the old way. At a second level, it was very clear, both in terms of the specification as well as the additional evidence that the court had before it, that the world of these devices kind of falls into two categories. You have self-expanding devices or balloon-expandable devices. Self-expanding devices use resilient wires that spring open on their own. Balloon-expandable devices use malleable wires. And in the back... What are the only two ways to do it, just technically? The only two ways we're talking about. Yes. Are there other ways? I think, to my knowledge, no. I mean, the world kind of falls into those two categories, and I acknowledge there's this issue with the molding balloon. But Dr. White himself has written articles that were, again, in front of the court where Dr. White wrote about the COOK device and characterized it as a self-expanding device, even though he acknowledged there's a molding balloon operation. So in terms of terminology, the way people understand these terms, the way people understand the way these devices operate, it's always been very clear that you've got self-expanding devices. Sometimes these self-expanding devices use molding balloons, but that does not change the fact that these devices, at their core, are self-expanding. And the only device that's ever been brought to the market, or there was an attempt to bring to the market, is the Edwards device, which was based on these patents. So, malleable, just so that we're on the same page, means not resilient to any substantial extent. It doesn't mean not resilient at all. Right. There's not a 100% fine line here, but I think the court below focused on the fact that you've got to look at the way this thing expands. And Cook's device, in terms of in light of the construction of malleable, a malleable device is one that, if you put it on the table, nothing's going to happen to it unless you exert the pressure from within for that balloon. Suppose it only got 50% of the way through. I know that's not your device. Well, I think one way to look at this is does the device expand on its own? Is it resilient enough to expand on its own that it actually attaches itself to the vessel, to the aorta? There's no question in this case that the Cook device and I think the Gore device attach on their own by virtue of their own resilience, and then the molding balloon is done in a second step. And that may be one way to look at it. If it only expanded 50%, you're probably not going to have a situation where it would attach to the aorta on its own. Now, I've used my time. You have agreed to split your time? Yes. And so we'll hear from Mr. Marcos. Thank you very much. Thank you for allowing me to talk. Please. I just have a few points to make. First, Edwards concedes in their appeal brief that our device is resilient. They said it outright in the brief. And in fact, it's made out of nitinol. And one of the pieces of prior art that was mentioned in the specification, which they criticized for being self-expanding, was a nitinol device. And that's the ALCO device. And as my co-counsel pointed out, the specification is narrow. It's limited to malleable wire. It defines the invention in terms of malleable wire. And as you point out, it defines malleable wire to exclude resilient wire. I also want to point out that our devices are oversized at all times. It's built right into the instructions for use. And what that means is that when the device, you know, is implanted on a delivery catheter and it's crunched down into a sleeve, and when it reaches a diseased portion, the sleeve is opened and the device springs open. And because it's oversized, it necessarily comes into contact with the vessel wall. So what happens later with the balloon is irrelevant because the inventors define malleable in terms of being non-resilient and also that it expands. It doesn't require a balloon to expand it into contact with the vessel wall. As a matter of pure physics, this device, in its fully expanded diameter, is larger than the diameter of the vessel that it's implanted. Council, what word in Claim 1 is a word that brings malleable wire limitation within... Well, it's the... It's the word... The claims... All the claims require the second implanted graft to be either anchored to, docked with, or attached to the first graft. And those are the words that bring in the malleable wire because at the Markman hearing, the judge, to lay the framework for the Markman hearing, asked a series of formal written questions. And one question they asked Edwards is, do you agree that the anchoring limitation can only be carried out with wire? And he answered unequivocally... Council for Edwards answered unequivocally, yes, it's the wire that does it. And it's clear that if it's interluminal, it has to have wire. In fact, Edwards, in their brief, refers to these interluminal devices as stent grafts, stent being a wire framework. It has to have wire. And once you get to that point, there's no other answer but it has to be malleable because the specification says that the invention is an alternative to the prior art. And they say the prior art is self-expanding. It's an alternative to that. And then it goes on and it criticizes the self-expanding wire. And it criticizes because it says you can't precisely control the expansion. Apart from the kinking. And clearly, they teach that you use a balloon where the physician can control the inflation of the balloon and then control the expansion. And then, of course, they have the definition. And there's numerous cases on any one of these grounds would be sufficient to find that it excludes resilient self-expanding wire. Any one of them. Cases holding that when you disclose and distinguish over prior art, the claims can't cover that, obviously. And when you define the invention in a way which excludes certain structures, the claims can't cover that. I just want to point out this balloon argument is not supported by any evidence that would be admissible in court. It's just attorney argument. When they say that the stents, the balloon causes the stent to further expand, that's just attorney argument. We know that the stent has to contact the vessel wall. Why do you use the balloon if you're not further sealing it, which is further expanding it? You're preventing an endo leak because these devices have the material sometimes folds up or scrunches up and you want to sort of even out the contact in the event that there is a leak. By contacting the wires and expanding them. Even out the contact. It has to have contacted the wall to begin with. And then because it's oversized to the extent that there is any further minimal expansion, it's due to the resilience of the wire. It's not due to any... These wires start off highly resilient and they don't magically convert to malleable just because a balloon is thrown in there. The wires could have expanded further but the wall prevented it. So if there's something preventing the wires from fully expanding all the way around, in other words, if there's a slight leak and the balloon smooths out the material or compacts... Smooths out by forcing the wire out into complete contact with the wall of the... No, by allowing the wire to further self-expand because the wire wants to further expand. It's built into it. It's not malleable. It doesn't magically become malleable. You mean it's resilient? It's resilient. It wants to further expand. It's prevented from doing so. To the extent the balloon allows that to happen, it's still the resilience of the wire that does it. The inventors defined malleable as something that doesn't expand by its own resilience. There's just no evidence in the record that the balloon causes any deformation, plastic deformation, or any expansion that the wires wouldn't undergo by themselves. So that's a red herring. They, in the patent office, the Edwards Council mentioned that there's a statement in the specification about stainless steel. Yes, it does say stainless steel, but it says, are preferably formed of stainless steel or another metal or plastic which is malleable. They defined what they meant. It had to be malleable. And, in fact, they specifically addressed this statement in the prosecution of the European patent, in the U.S. Patent Office. That very statement they addressed and they said that it discloses non-springy structures. And they referred very specifically to the very sentence that they rely on now as teaching that it doesn't have to be malleable. It can be springy, resilient. And they told the U.S. Patent Office, quote, in contrast, this application discloses non-springy structures. See page four, lines 33 to 35. That's this very sentence in the specification. And it says, referring to the wire formed from stainless steel and malleable plastic and not to spring steel or any other spring material. So they tell the patent office one thing, and then they come here and tell you another. We've let you run over, Mr. Marcus, because we're giving Mr. Abrams a little extra time. Anything further you want to point out? No, thank you. Great, thank you. Mr. Abrams, we'll give you your five minutes if you need it. If Edwards had used the term malleable wire in the claim, we would be bound by a definition in the specification. But we didn't. If Edwards had used the term intraluminal in the claim, we would be bound by a definition in the spec. But we didn't. That was deleted. The district court gave no weight whatsoever to the prosecution history here. What about the fact that you continued, in the very action in which you deleted intraluminal, to refer to the present invention as an intraluminal graft? Well, first, what we're referring to there is the fact that one piece is intravascularly placed. We wanted to make clear that we weren't making this a conventional graft. And second, why would we delete intraluminal graft and then say, oh, but it is an intraluminal graft? I think in the context, if one looks at the prosecution, what we were saying was that one of these pieces is still intravascularly placed or intraluminally placed. That's what meant by anchored within, is that something has some structure to allow it. Now, counsel is incorrect that we conceded that there was some structure here. What we told the district court, the district court's question was, well, what in the spec does the anchoring within? And we said, well, it could be done in a number of different ways, perhaps by a friction fit. But, Your Honor, to answer the question, what's in the spec? Wire. Wire is disclosed in the spec to do it. But the district court did not adopt the definition of malleable wire that's in the specification. The specification says, as Your Honor pointed out, not resilient to any substantial extent. The district court started out saying, well, these could be balloon expandable. So we presented evidence. And contrary to what counsel for Gore says, the evidence is replete in the record about publications by Gore and Cook talking about expanding the graph with a balloon. There's a video where it shows the wires expanding. Their own witnesses all admit that, yes, the reason you use this is to fix a leak. You've got to expand the graph. You have to expand the wires. So what the district court did in the summary judgment order at A11 said, what we'll define is whether they're capable of expanding without the exertion of pressure upon them. In other words, the district court took an even more narrower definition in order that it could deal with the conflicting evidence on summary judgment, that balloons were used. Now, counsel's incorrect that, well, there's balloon expandable and self-expanding. That may be true in 2007 or 2008 or 2009 when declarations are filed. But this invention occurred in 1993. And as the inventor, Dr. White, testified, the word interluminal graph wasn't even used at that time. We talk generally about graphs and endovascular and that sort of thing. I think critically here, when Gore points to, for example, the European prosecution and says, oh, they told the Patent Office one thing and tell you something else, wait a minute. That's a different claim. This patent includes a number of inventions and a number of different features. And some of those features relate to wires. And there is a claim in Europe that has nothing to do with overlapping, no overlapping. It claims a wire. And in fact, it claims a malleable wire. And we said, yes, we define malleable in the spec. And we're bound by that when we put it in the claim. But we didn't put that in the claim in the US. And the district court looked at this and said, I'm going to read that back into the claim even though it's not there. And that's why I think the problem happens here. I think Your Honor is correct. When Judge Moore asked, well, should we be looking to the specification to define these? Yes. If a term is defined specifically in the claim, in the specification that's used in the claim, I think this court's cases are clear. If we had used malleable, we're bound by that definition. But in this case, that's not in the claim. And I think if one looks at the- What about disclaimer? I mean, if we look at this anchored within language and we have to figure out how it's anchored within, in the absence of a disclaimer, you would presume in all the different cover by your claim all the different methods of anchoring. But what about the fact that in the spec you talk about what an advantage this is over the prior art methods of resilient wires? Well, the distinct- Is that an assignment type disclaimer? No, because that disclaimer doesn't relate to the question of malleable versus self-expanding. I mean, that's the point. If you look at a disclaimer, I think this court says it has to be clear and unequivocal. Didn't you distinguish Piplani by saying the application teaches that the wire forms are malleable? That was in a continuation application where there was a claim that related to that type of wire. You're dealing with the same specification, aren't you? But it's a completely different invention. Like many patents, this has a number of different inventions. Some relate to overlapping. And that's a very broad invention, we think. And those claims have a basic structure. There are other inventions that relate to, for example, the wires, having wires up at the top, which is what Piplani dealt with. So one can snag with the- and we had a claim in Europe, as well as in the continuation, to just a tube graph, not an overlap. And in that tube graph- Mr. Abrams, we've been very malleable with your time. But I think we ought to call this argument to an end. Thank you. Thank you, Your Honor. Case will be submitted.